**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**IN THE MATTER OF THE**
**APPLICATION OF THE UNITED**          **Case No. 22-mj-08078-ADM**
**STATES FOR AUTHORIZATION**
**TO CONDUCT A SEARCH OF:**

**A BLACK APPLE I-PHONE WITH**
**CRACKED SCREEN**
**CELLULAR TELEPHONE**
**AND ITS ENCLOSED SIM CARD**

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

I, Robert Evans, a Task Force Officer with the Federal Bureau of Investigation (FBI),

being duly sworn, hereby depose and state as follows:

1.     I am an "investigative or law enforcement officer" of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, and empowered by law to conduct

investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United

States Code. I have been a Task Force Officer of the Federal Bureau of Investigation (FBI) since

December 2017, and I am currently assigned to the Kansas City Division of the FBI.  I am

specifically assigned to the Homicide-Aggravated Assault and Long-Term Offender (HALO)

Task Force. I am also Detective with the Kansas City, Missouri Police Department and have

been employed by Kansas City Missouri Police Department for 22 years. I have been assigned to

the Kansas City Missouri Police Department Narcotics Division since 2006, performing tactical

operations and conducting narcotics investigations.  As a FBI Task Force Officer assigned to the

Homicide-Aggravated Assault and Long-Term Offender (HALO) Task Force my official duties

include, but are not limited to investigation into gangs, criminal violations of the Controlled

Substances Act, organized crime, and ongoing criminal enterprises.  During my time as a Task Force Officer and Detective, I have participated in various gang and controlled substance violation investigations.  While conducting the investigations, I have assisted with Title-III intercepts; been the affiant on pen registers, Global Positioning System (GPS) cellular telephone tracking warrants, and assisted with search warrants on social media accounts.  I have conducted extensive interviews, controlled drug purchases, surveillances, search warrants and arrest warrants. My training and experience have involved, among other things: (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealment of proceeds of drug trafficking; (b) surveillance; (c) analysis of documentary and physical evidence; and, (d) my participation of previous wire intercept investigations.  Based on my training and experience as a Detective and a FBI Task Force Officer, I have become familiar with the manner in which illegal drug traffickers conduct their drug-related businesses, including the methods employed by drug dealers to import and distribute illegal drugs, and their use of coded language to refer to illegal drugs, drug proceeds, and other aspects of illegal drug trafficking.  I have been personally involved in numerous investigations involving the unlawful possession, manufacture, distribution, and smuggling of controlled substances and I have participated in wire intercept investigations.  I also have experience using internet search engines and social media websites such as "Facebook", "Twitter", and "Instagram" to conduct criminal investigations.

2.      The information contained in this affidavit is based upon my investigation and information provided by other law enforcement officers and other persons whom I believe to be reliable.

3.      This affidavit is in support of an application for a search warrant for a black Apple IPhone cellular telephone with a cracked screen and its enclosed SIM card recovered under FBI Evidence number #1B26 (hereafter referred to as the "**Target Device**").  The **Target Device** is located in Kansas City, Kansas within the District of Kansas.

4.      As explained below, I believe there is probable cause to believe the **Target Device** may contain records, communications, documents, or photographs, in any form, regarding the conspiracy, planning, execution, distribution, or concealment of the illegal transportation of illegal controlled substances, in violation of Title 21 United States Code, Sections 841(a)(1), (b)(1)(C).  I believe the **Target Device** may also contain records, communications, documents, or photographs, in any form, which contain saved directories of names, addresses, and contact information of associates of the user and evidence of user attribution showing the ownership and identifying the user, or location of the user device at the time things in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents and browsing history.   I know based upon my training and experience that cellular phones are commonly used to assist in the commission of a crime, to plan or research the commission of a crime, to document criminal actions, to communicate with any possible co-conspirators, and to flee from the scene of the crime to avoid apprehension. Further, I know based upon my training and experience, that subjects involved in criminal activity, including drug trafficking, will sometimes take a photographic record of their criminal activity and share it with associates and a common method to distribute that type of information is electronically Through cellular/mobile phones.

**Facts Supporting Probable Cause**

5.      The captioned investigation is a joint matter involving the following law enforcement agencies: Federal Bureau of Investigation ("FBI"), Alcohol Tobacco and Firearms ("ATF"), the Kansas City Kansas Police Department, the KCMOPD (referred to jointly as "investigators"), and the United States Attorney's Office, District of Kansas ("USAO"). This investigation focuses on the Cleon White drug trafficking organization (hereinafter the "White DTO"). As described in more detail below, there is evidence the White DTO distributes illegal controlled substances in the Kansas City metropolitan area.

6.      Investigators initiated an investigation into the White DTO in September 2021. White is believed to be responsible for numerous violent crimes throughout the Kansas City metropolitan area and the violence is believed to involve controlled substance distribution. Historical review of cellular telephones recovered from White during a violent crime investigation revealed photos of bulk crack cocaine and marijuana. Additionally, there were numerous SMS messages regarding the distribution of narcotics and contacts saved in the phone known to investigators to distribute narcotics.

7.      In November of 2021 investigators met with a confidential human source (CHS) who advised that White sold crack cocaine out of a barbershop near 12th and Prospect. The CHS also advised that White had recently robbed some "Mexican Drug Dealers" of 5 kilos of cocaine near 12th and Quindaro in Kansas City, Kansas and then began to sell the cocaine through the White DTO.

8.      In November 2021, investigators identified a known location that White frequented, 3032 Hutchings Avenue in Kansas City, Kansas. Investigators monitored and

surveilled the location. Observations revealed high levels of vehicle traffic, foot traffic, and interactions consistent with the sales of illegal controlled substances.

9.      In December 2021, investigators were conducting surveillance at 3032 Hutchings Avenue in Kansas City, Kansas. White was observed entering the residence. Short time later a red SUV stopped in front of the house briefly. The driver of the red SUV made entry into the residence and a short time later exited the residence and was followed by an unknown subject. Both entered the red SUV briefly and then the unknown subject exited the vehicle and re-entered the house. The SUV drove away and was under constant surveillance by investigators until the Missouri Highway Patrol conducted a traffic violation on the vehicle.

10.     During the stop, Missouri State Highway Patrol Troopers recovered approximately 373.1 grams of methamphetamines. The driver and the passenger were placed under arrest.

11.     During a custodial interview, the passenger, hereafter Subject #1, admitted to distributing illegal controlled substances and obtaining the illegal controlled substances through an individual he knew as "C" or "CW". Consent was obtained from Subject #1 for a search of their cell phone and investigators observed a contact saved as "C-Dub". Additionally, Subject #1 admitted to arranging purchases for approximately 30 pounds of methamphetamine from "CDub" over a six-month period. Subject #1 identified two numbers for "C-Dub, 816-315-7022 and 816-377-9034.  Investigators believe these are two cellular numbers utilized by Cleon White; 816-315-7022 (White cell #1) and 816-377-9034 (White cell #2).

12.     Investigators know from historical cases regarding White that he is often referred to by others as "C". Investigators believe "C-Dub" was another moniker for White.

13.     Furthermore, a review of conversations between Subject #1 and "C-Dub" revealed Subject #1 ordered methamphetamines and black tar heroin from White. During one conversation Subject #1 stated to "C-Dub", "4 and a half and a shirt of dark". Investigators believe this to be an order for 4 ounces of methamphetamines and 1.5 grams of black tar heroin.

14.     Pursuant to an administrative subpoena for 816-315-7022 (White cell #1), investigators conducted detailed telephone analysis and identified several top callers who are believed by investigators to be involved in the distribution of illegal controlled substances. 816-315-7022 (White cell #1) was subscribed to "Say Say" at 2601 Independence Avenue, Kansas City, Missouri and was established on April 12, 2021.

15.     Pursuant to an administrative subpoena for 816-377-9034 (White cell #2), investigators also conducted detailed telephone analysis and identified several top callers who were also known to investigators to be involved in the distribution of illegal controlled substances. 816-377-9034 (White cell #2) was subscribed to Terrence Clark at 6751 Paseo Boulevard, Kansas City Missouri and was in a "non-pay" status as of December 16, 2021.

16.     Investigators know that illegal narcotic dealers and drug traffickers will use moniker, aliases, and fake names when entering subscriber information for a new cellular telephone.

17.     In January of 2022 telephone analysis of 816-315-7022 (White cell #1) led investigators to believe White had an additional cell phone he was using to conduct illegal narcotic transactions.

18.     A detailed telephone analysis was conducted using the top callers of 816-315-7022 (White cell #1) and 816-377-9034 (White cell #2). The analysis revealed that 816-377-9034 (White cell #1) and 816-315-7022 (White cell #2) shared the same 55 contacts with 816-

812-9153. Additional analysis revealed that White's believed girlfriend and three other top callers only shared two numbers in common, 816-377-9034 (White cell #2) and 816-812-9153. Investigators believe that 816-812-9153 (White cell #3) was a cell number used by Cleon White.

19.     On February 16, 2022, the District of Kansas issued a cellular location/GPS search warrant for cellular telephone 816-812-9153 (White cell #3). On February 22, 2022, the District of Kansas issued a Pen Register and Trap Trace Order for 816-812-9153 (White cell #3). GPS location analysis and Pen Register Trap and Trace analysis for 816-812-9153 (White cell #3) revealed that White was the user of the cellular telephone number. Investigators observed telephonic contacts with known drug dealers.

20.     During the course of the investigation, investigators believed that White was also utilizing another cellular telephone in conjunction with 816-812-9153 (White cell #3).

21.     Investigators know from previous statements that it is common for White to utilize more than one cellular telephone to conduct the sales and distribution of controlled substances.

22.     Review of pole camera at 3032 Hutchings on February 24, 2022, revealed that White was at the listed location at approximately 1:41 p.m. Three different interactions were observed over a three-hour period that were consistent with illegal sale of controlled substances. Cell phone analysis of 816-377-9034 (White cell #2) during this time lead investigators to believe that White was could also be utilizing an additional cellular telephone to conduct illegal controlled substance transactions.

23.     On or about March 4, 2022, investigators contacted a known associate of White's, hereafter Subject #2. Subject #2 consented to a search of their phone and investigators observed a contact saved as "Big Clee" with a number of 816-547-6946. Subject #2 stated 816-547-6946

was a new number for "Big Clee", but that he had met "Big Clee" at a gas station on Quindaro to

purchase some marijuana a few days ago.

24.     Investigators believe that "Big Clee" is another moniker for White and that 816-

547-6946 was a number utilized by Cleon White. 816-547-6946 (White cell #4).

25.     Subject #2 further stated an individual they only knew as "D" uses telephone

number 816-269-7008. Subject #2 has bought illegal controlled substances from "D" in the past

and "D" is known to be a dealer of illegal controlled substances.

26.     Toll analysis of 816-547-6946 (White cell #4) was conducted pursuant to

Administrative Subpoena #762406. During the toll analysis, investigators identified additional

numbers of known and suspected illegal narcotic dealers. Primarily telephone number 816-269-

7008, attributed to "D", was a contact of 816-547-6946 (White cell #4). 816-269-7008 was

identified to be used by a known White associate, Davareos Noel.

27.     On March 21, 2022, Cleon White was charged in Jackson County, Missouri for

five counts of a criminal offenses; respectively: Count 1: Murder 2nd Degree; Count 2: Armed

Criminal Action; Count 3: Murder 2nd Degree; Count 4: Armed Criminal Action; Count 5:

Unlawful Use of a Weapon.

28.     On March 24th, 2022 members of the FBI Violent Crime Task Force/HALO and

members of the Kansas City Missouri Police Department's Street Crime Tactical Squad arrested

Cleon White for a Jackson County, Missouri murder arrest warrant.

29.     Prior to conducting the arrest of White, surveillance crews began a stationary

surveillance operation at 10235 West 86th Terrace, Overland Park, Kansas. During the

surveillance operation, White was observed entering the front passenger seat of a gray 2015

BMW (model X6 SUV KS LP# 176-PPN). This vehicle is owed by Jasmine Hamilton who is a

known girlfriend and roommate of White. Hamilton and White have both been observed driving this vehicle in the past by Law Enforcement. Hamilton was observed entering the driver's seat of the BMW and both departing the residence in the vehicle.

30.     During the surveillance portion of White's arrest, Investigators believe that White had observed the surveillance crews (ground and aerial) and had made efforts to thwart law enforcement from following him. Surveillance crews observed White enter a large apartment structure in downtown Kansas City, Missouri after exiting the known BMW. White then exited a different door than he had entered into the apartment complex and enter a vehicle Law Enforcement had never seen or known him to drive (blue 2016 Nissan Rogue).

31.     After following White with both ground and aerial surveillance, White was observed pulling over the side of the road, exiting the Nissan and looking up and down the street. From experience, Investigators know this a technique used to observe any Law Enforcement surveillance vehicles. Once White returned to his vehicle, he was again followed by surveillance crews to a known barbershop (Aljay and Son's barbershop located at 3533 Independence Avenue, Kansas City, Missouri) in Kansas City, Missouri that Investigators know sells large amounts of narcotics from and have a current investigation.

32.     White was observed meeting with Justin Wiggins (known drug trafficker/current KCMOPD and FBI investigation) from the business.  White was also observed having Wiggins enter his car and both were observed entering the barbershop Wiggins owns prior to his arrest. White was then observed exiting the barbershop and reentering the Nissan Rogue.

33.     Tactical Officers moved into the area and arrested White inside the Nissan Rogue.

34.     When White was arrested in the Nissan Rogue, he was found to be in possession of no personal property on him or his vehicle. Investigators found this to be odd that White did

not have a cell phone, identification, or wallet in his possession. Investigators know from this investigation, White continually appears to have several cell numbers/phones at all times. While being processed on scene, White requested Tactical Officers to enter the barber shop and obtain "J's" phone number from the employee (Wiggins, who Tactical Offices are not familiar with). This request was not granted.

35.    After processing White, he was seated into the KCMOPD patrol wagon. The affiant observed Justin Wiggins open the door to the barbershop and step out onto the sidewalk. Wiggins was observed and heard yelling in the direction of White. The affiant and other Investigators immediately walked to the barbershop to contact Wiggins. As Wiggins was approached, he was observed stepping back into the barbershop.When Investigators got close enough to the barbershop they observed Wiggins stepping back into the threshold of the barbershop, slightly leaning out, but blocking enough of the door so Investigators could not see inside. Investigators then walked to the door of the barbershop. When Wiggins was asked if he needed assistance, he stated White was yelling something to him, but he could not hear him. The on-scene Investigators informed Wiggins they would walk across the street and into the parking lot to see what White was trying to communicate to Wiggins. The affiant informed Wiggins that they believed White had requested a phone number for "J". Wiggins initially stated he did not know who that was. Investigators then informed Wiggins "Jasmine". The affiant was aware that White had asked the Tactical Officers for this information. Wiggins again appeared confused, then abruptly stated "oh, his girl". The affiant told Wiggins that Cleon White had said he wanted his phone as well. Wiggins stated "no he didn't".

36.    After Wiggins declined getting White's phone, he stated he would go look at his phone for the requested number. At this moment, he stepped back into the barbershop. Wiggins

then locked the exterior heavy door's deadbolt and a secondary lock. Wiggins then shut an interior heavy barred door and locked it with what appeared to be a key from the inside. Prior to Wiggins stepping inside, it was apparent from his body language (blocking the door) he had no intention of letting the affiant or Investigators inside the shop.

37.     Investigators approached White and asked what he was wanting to tell Wiggins. White stated to tell Wiggins to get him "J", then expanded to "Jasmine's" number to him. This information was relayed to the affiant and other Investigators standing at the barbershop door.

38.     A moment later, Wiggins returned to the door and unlocked both doors and opened the exterior door. Wiggins again never moved away from the threshold and blocked the doorway with his body to interfere with Investigators looking inside the barbershop. Wiggins informed the affiant he did not have the number and closed the door and was heard starting the locking process again as Investigators walked away.

39.     After the arrest of White, Investigators responded to 10235 West 86th Terrace, Overland Park, Kansas to contact Jasmine Hamilton. After knocking at the residence door, it was determined there was no one at home and the affiant left a business card.

40.     On March 25, 2022 at 07:20 AM, the affiant received a phone call from 913-406-4955. The caller identified herself as Ms. Jasmine Hamilton. Hamilton stated she had found the affiant's business card in her front door earlier in the evening and was inquiring why the card was in her door. The affiant informed Hamilton Investigators were wanting to meet face to face with her in regard to her association with Cleon White.

41.     Hamilton asked if Investigators were aware White had been arrested the previous day which she was informed they were. Hamilton then agreed to meet with Investigators later in the day.

42.     On March 25, 2022 at approximately 11:27AM, Investigators began to observed Kansas City metro area license plate readers (LPR) hits for the gray 2015 BMW (model X6 SUV KS LP# 176-PPN) owed by Jasmine Hamilton. Due to the location of the hits (urban Kansas City, Kansas), Investigators began a surveillance operation to observe the movements and actions of the driver of the vehicle. Investigators observed the vehicle at #3 McGrew Grove, Kansas City, Kansas. Investigators are aware that address is occupied by James Flippen, who is a top caller on White's previous phones and is currently on Kansas state supervisor for distribution of a controlled substance. Investigators continued to follow the BMW and observed it to make several traffic violations.

43.     On March 25th, 2022 at approximately 12:20PM, uniformed Police Officers with the Kansas City Kansas Police Department were requested to stop the  gray 2015 BMW (model X6 SUV KS LP# 176-PPN) near I-635 and Leavenworth Road (just south/ driving south) for the various traffic violation Investigators had observed. While officers were attempting to catch up to the BMW to conduct the traffic stop, an Investigator observed the front passenger window roll down and a hand from inside the vehicle throw a black cell phone (Apple I-Phone with cracked screen, now referred to as the **Target Device**) out of the vehicle which landed along the west shoulder of the highway. An investigator immediately stopped and recovered the phone. When uniformed Officers with the Kansas City, Kansas Police Department got behind the BMW and activated their emergency equipment, the BMW sped away from the Officers and failed to stop for them.

44.     On March 25, 2022 at 12:40 PM, while the **Target Device** was being transported back to Law Enforcement facility, an incoming call was observed from 816-294-1445. A photo of the incoming call was taken to allow Investigators to recall the incoming phone number.

45.     On March 26, 2022 an administrative subpoena was submitted for 816-294-1445. Upon receiving the results, it was determined that 816-294-1445 had called 816-668-2498 (the **Target Device**) at the corresponding time the missed incoming call was observed and subsequently 816-294-1445 had missed contacts with the **Target Device**. Based on this information, Investigators believe the phone number assigned to the **Target Device** is 816-668-2498.

46.     During the detailed telephone analysis of 816-294-1445 (missed called number to Target Device), investigators learned that 816-294-1445 had 77(x) contacts with 816-812-9153 (White cell #3), 22(x) contacts with 816-547-6946 (White cell #4) and has 7(x) contacts with 816-315-7022 (White cell #1).

47.     Pursuant to an administrative subpoena for 816-668-2498 (the **Target Device**), investigators learned the subscriber information for the **Target Device** was assigned to "Zay Zay" at 2609 Independence Ave, Kansas City, Missouri and was activated on February 20, 2022.

48.     Investigators know that 816-315-7022 (White cell #1) was subscribed to "Say Say" at 2601 Independence Avenue, Kansas City, Missouri and was established on April 12, 2021.

49.     Investigators conducted detailed telephone analysis of the **Target Device** and identified several callers who were observed to be on several other numbers believed to be used by Cleon White. One of those numbers being 816-678-5974 which has 7(x) previous contacts with the **Target Device**. Investigators believe 816-678-5974 is used by Justin McDonald. 816-678-5974 has previous contacts with 816-812-9153 (White #3) and 816-377-9034 (White Cell #2).

50.     The **Target Device** was seized and remains in the custody of the FBI at an undisclosed location.  The **Target Device** was electronically locked upon seizure.

51.     Investigators believe that the **Target Device** is a cellular phone used in the White DTO and contains information pertinent to the investigation of the White DTO.

## REQUESTED AUTHORIZATION

52.     At the time of the presentation of this affidavit, the above-described **Target Device** is in the possession of the FBI in the District of Kansas. Pursuant to Federal Rule of Criminal Procedure 41(b) (2), the **Target Device** may be moved outside the District of Kansas for the purpose of executing the search warrant.

53.     From training and experience, I know individuals engaged in drug trafficking often use cellular telephones to set up their transactions and frequently have stored text messages, phone calls, and stored image and video files indicating prior illegal transactions. I also know GPS devices store location data, sometimes for years, of previous visited locations and the date and time of those visits. I am also aware that communication with fellow drug dealers and drug customers occur by a variety of means, including: email, chats through social networking sites, chats through other internet clients, and other means facilitated by computers/smartphones being used on the internet and that individuals involved in drug use and drug trafficking will often store information on cellular phones related to their drug trafficking activity. Further, I know that drug traffickers are routinely aware of potential incriminating evidence contained in these electronic devices and will, upon law enforcement contact, attempt to separate themselves from these devices by discarding them while fleeing from arrest, breaking them before law enforcement seizure, concealing them from view, and/or declining ownership.

54.     I request authority to search the following **Target Device**, a black Apple iPhone cellular telephone with cracked screen and its enclosed SIM card.

The applied for search warrant would authorize the forensic examination of the **Target Device** described in this application and affidavit for the purpose of identifying electronically stored data particularly described in Attachment B.

### Technical Terms

55.     Based on my training and experience, I use the following technical terms to convey the following meanings:

56.     Wireless/cellular telephone: A wireless telephone (or mobile phone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books" or "contacts" lists; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

57.     Geotagging: Geotagging is a feature that geographically tags the location and time of a photograph taken. The data saved at the time the image is captured is usually placed in a

JPEG file using the exchangeable image file format (EXIF). The metadata within the EXIF is

then readable by numerous photo editing software programs. Simply defined, metadata contains

data that describe a file. In the case of EXIF metadata, it is data that describes data used by

digital cameras, digital imaging software, and others to describe the particular attributes of a

digital image file. The tagging information is added to photographs or video at the time it is

taken if the geotagging tool is enabled in the camera settings. Programs such as Google Maps

can be used to track the location a photograph or video was taken using the metadata encoded in

photograph or video.

58.     SIM card: SIM cards, or Subscriber Identity Module cards, or Subscriber

Identification Modules, are plastic cards that have an embedded circuit on them that stores

personal information of the account holder, including his or her phone number, address book,

text messages and other data. A SIM card user can easily change cellular phone handsets by

simply removing the SIM card from one handset and placing it in another compatible handset. In

addition to the SIM card's ability to identify the cell phone user's phone number, contacts list,

and text messages, the SIM card stores information used by the wireless carrier to identify the

subscriber.

59.     SD Cards: SD cards are a type of storage medium that come in various sizes.

Some wireless telephones contain removable SD cards, on which the phone can store data,

including but not limited to pictures, video, audio recordings, and contact lists.

60.     Based on my training, experience, and research, I know that the listed cellular

telephone(s) have/has capabilities that allow it to serve as a wireless telephone, digital camera,

portable media player, GPS navigation device, and PDA (personal digital assistant). In my

experience, examining data stored on devices of this type can uncover, among other things,

evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

61.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can

sometimes be recovered with forensics tools.

62.     There is probable cause to believe that things that were once stored on the Target

Device may still be stored there, for at least the following reasons:

63.     Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been downloaded

onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a

storage medium can be stored for years at little or no cost. Even when files have been deleted,

they can be recovered months or years later using forensic tools. This is so because when a

person "deletes" a file on a storage medium, the data contained in the file does not actually

disappear; rather, that data remains on the storage medium until it is overwritten by new data.

64.     Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being used by an active

file—for long periods of time before they are overwritten. In addition, a computer's operating

system may also keep a record of deleted data in a "swap" or "recovery" file.

65.     *Forensic Evidence*: As further described in above, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Target Device  was/were used, the purpose of its use, who used it/them, and when. There is

probable cause to believe that this forensic electronic evidence might be on the Target Device

because:

66.     Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a

paragraph that has been deleted from a word processing file). Virtual memory paging systems

can leave traces of information on the storage medium that show what tasks and processes were

recently active. Web browsers, e-mail programs, and chat programs store configuration

information on the storage medium that can reveal information such as online nicknames and

passwords. Operating systems can record additional information, such as the attachment of

peripherals, the attachment of USB flash storage devices or other external storage media, and the

times the computer was in use. Computer file systems can record information about the dates

files were created and sequence in which they were created.

67.     Forensic evidence on a device can also indicate who has used or controlled the

device. This "user attribution" evidence is analogous to the search for "indicia of occupancy"

while executing a search warrant at a residence.

68.     A person with appropriate familiarity with how an electronic device works may,

after examining this forensic evidence in its proper context, be able to draw conclusions about

how electronic devices were used, the purpose of their use, who used them, and when.

69.     The process of identifying the exact electronically stored information on a storage

medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic

evidence is not always data that can be merely reviewed by a review team and passed along to

investigators. Whether data stored on an electronic device is evidence may depend on other

information stored on the device and the application of knowledge about how an electronic

device behaves. Therefore, contextual information necessary to understand other evidence also

falls within the scope of the warrant.

70.    Further, in finding evidence of how a device was used, the purpose of its use, who

used it, and when, sometimes it is necessary to establish that a particular thing is not present on a

storage medium.

71.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e) (2)

(B), the search warrant I am applying for would permit the examination of the Target Device

consistent with the search warrant. The examination may require authorities to employ

techniques, including but not limited to computer-assisted scans of the entire medium, that might

expose many parts of the device to human inspection in order to determine whether it is evidence

described by the warrant. After the initial imaging, the examiner and agents will not further save

or copy data unrelated to the violations set forth in the application and affidavit. To the extent

possible, they will minimize the review of unrelated data.

72.    *Manner of execution.* Because this search warrant seeks only permission to

examine devices already in law enforcement's possession, the execution of this warrant does not

involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause

for the Court to authorize execution of the search warrant at any time in the day or night.

### Conclusion and Request

73.    Based upon the foregoing, my training and experience, and through the evidence

gathered in the course of this investigation, there is probable cause to believe that the **Target**

**Device** (as described in Attachment A) contains documents, photographs, text messages, e-mails,

address books or contacts lists, call logs, audio files, and other types of electronic media, that

constitutes evidence and/or fruits and instrumentalities of criminal offenses, including the of

Distribution of illegal controlled substances, in violation of Title 21 United States Code, Sections

841(a)(1), (b)(1)(C).

Respectfully submitted,

Task Force Officer Robert Evans

Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim.
P. 4.1.by telephone.

HONORABLE ANGEL D. MITCHELL
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**"Property to be searched"**

A black Apple IPhone cellular telephone with a cracked screen and its enclosed SIM card recovered under FBI Evidence number #1B26 (referred to as the "Target Device").  The Target Device was recovered on the side of the highway near I-635 and Leavenworth Road (just south)

The Target Device is currently located in Kansas City, Kansas within the District of Kansas at a secure Law Enforcement Facility.



**ATTACHMENT B**
**"Property to be Seized"**

All records, data and information on the listed cellular telephones described in the affidavit relate to violations of Title 21, United States Code, Sections 841(a)(1), 843, and 846 and probable cause exists to believe the information and items listed herein will be found secreted in the listed cellular telephones, including:

a.      Lists of customers and related identifying information.

b.      Any information recording meetings, deliveries, the schedule and travel of the parties involved in drug trafficking.

c.      Contact information, incoming and outgoing call information, pictures, videos, stored voicemail and text messages.

d.      Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions.

e.      Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information).

f.      Device ownership and user information, including evidence of user attribution showing who used or owned the Device at the time the things described in the warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

g.      Photographs, images, and videos of drug trafficking activity, drug trafficking associates, instrumentalities or proceeds of drug trafficking; including stored information related to the date, time, user and owner of the device, and location of the image generation.

h.      Any geotagging information such as the camera's date and time clock, make and model, serial number, and location of photographs and videos determined by the camera's Global Positioning System receiver or geotagging tool.  Including any identification information related to the use and ownership of the devices.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.